# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **JAMES RAY SMITH,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:11-cv-739** |
| | ) | |
| **STATE OF TENNESSEE BOARD OF** | ) | **Judge Sharp** |
| **PROBATION AND PAROLE and** | ) | |
| **JIM LEACH, Officer,** | ) | |
| | ) | |
| **Respondents.** | ) | |

## MEMORANDUM OPINION

Petitioner James Ray Smith was convicted and sentenced by the Criminal Court for Putnam County, Tennessee after a jury trial in 2004.  Now before the Court is his petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  (ECF No. 1.)  Smith, who has already served his prison sentence and resides in Baxter, Tennessee, remains on lifetime community supervision.  He is therefore still in custody for purposes of the Court's jurisdiction of his habeas petition.  *See Jones v. Cunningham*, 371 U.S. 236, 243 (1963) (holding that a state prisoner who has been placed on parole is "in custody" for purposes of habeas statute); *McVeigh v. Smith*, 872 F.2d 725, 727 (6th Cir.1989) (petitioner serving a term of probation at the time her habeas petition was filed satisfied the "in custody" requirement of 28 U.S.C. §§ 2241(c)(3) and 2254(a)).

## I.      BACKGROUND and PROCEDURAL HISTORY

On September 17, 2004, petitioner James Ray Smith was convicted on one count of rape, one count of sexual battery, and one count of attempted false imprisonment by a jury in the Criminal Court for Putnam County.  On January 24, 2005, the petitioner was sentenced to eight years, one year, and six months on those convictions, respectively, all to be served concurrently.  (ECF No. 23-5, at 56–58.)  The petitioner asserts that the judgment was amended on September 25, 2005 to add a provision for lifetime community supervision after release from prison, but that he was not notified of the amendment until 2011.  The amended judgment to which the petitioner refers is not in the record before this Court.  Tennessee statute does provide, however, that anyone who is convicted of rape under Tenn. Code Ann. § 39-13-503 on or after July 1, 1996 "shall receive a sentence of community supervision for life."  Tenn.

Code Ann. § 39-13-524(a)(1).  The Tennessee courts have further recognized that whenever the trial court fails to check the box on the judgment form to indicate that a defendant is sentenced to community supervision for life in addition to whatever prison term applies, the trial court has "the authority, as well as a duty, to correct the judgment as soon as the error is brought to [its] attention."  *State v. Nagele*, 353 S.W.3d 112, 119–20 (Tenn. 2011) (citations omitted).  This is apparently what occurred in the petitioner's case, as the appropriate box for lifetime supervision was not checked on the judgment for rape that was made part of this Court's record.

The petitioner was denied relief on direct appeal.  *State v. Smith*, No. M2005-00615-CCA-R3-CD, 2006 WL 264468 (Tenn. Ct. Crim. App. Jan. 31, 2006).  The Tennessee Supreme Court denied Smith's request for permission to appeal on May 1, 2006.  Smith then filed a petition for post-conviction relief in the state court on October 19, 2006, which was denied initially and on appeal.  *Smith v. State*, M2009-02077-CCA-R3-PC, 2010 WL 4952541 (Tenn. Ct. Crim. App. Nov. 29, 2010).  The Tennessee Supreme Court denied permission to appeal on April 13, 2011.

Smith filed his original petition for the writ of habeas corpus (ECF No. 1) on June 21, 2011.  He filed an amendment to his petition on July 12, 2011 (ECF No. 5) (titled simply, "Amend"), and, at the Court's request, submitted an amended petition using the court-approved form on August 11, 2011 (ECF No. 16).  In this second amended petition, the version submitted on the court-approved form, the petitioner asserts six separate "grounds" for relief, as follows:

(1)  That trial counsel was ineffective for failing to object when the trial court informed the parties that he had seen jurors and witnesses eating lunch together and for failing to question the jurors himself after he learned that information;

(2)  That trial counsel was ineffective for failing to demand a mistrial after the judge informed the parties that he had witnessed five members of the jury having lunch with two state witnesses;

(3)  That trial counsel was ineffective for failing to raise any issue about the five members of the jury having lunch with two state witnesses in the direct appeal;

(4)  That trial counsel was ineffective for failing to file a motion to suppress statements the petitioner gave to Officer Henley before Officer Henley gave the petitioner a *Miranda* warning;

(5)  That the petitioner was deprived of his constitutional right to a fair trial and due process as a result of the trial judge's failure to *sua sponte* declare a mistrial after he witnessed five jurors having lunch with two state witnesses; and

(6)  That the petitioner was deprived of his constitutional right to a fair trial and due

process as a result of the trial judge's *ex parte* communications with the jury and state witnesses upon seeing them sitting at the same table having lunch.

(*See* ECF No. 16, at 5, 6, 8, 10, 12, 13.) In his original petition and the first amendment thereto, the petitioner raised some of the claims asserted in his second amended petition, but he also included several additional claims that are not reiterated on the most recently filed document.[1]

Shortly after the second amended petition was filed, the Court conducted a preliminary examination thereof and determined that it stated colorable claims for relief. Accordingly, the Court entered an order (ECF No. 17) directing the respondents to answer, plead or otherwise respond to the petition. Rule 4, Rules Gov'g § 2254 Cases.

The respondents submitted their Answer along with copies of most of the relevant documents from the underlying criminal proceedings. After obtaining the Court's permission, the respondents filed an amended answer (ECF No. 25) on November 1, 2011. The answer only addresses those issues raised in the petitioner's second amendment to his petition. Upon consideration of the original and amended petitions, the amended answer, and the expanded record, the Court finds that an evidentiary hearing is not needed in this matter. *See Smith v. United States*, 348 F.3d 545, 550 (6th Cir. 2003) (an evidentiary hearing is not required when the record conclusively shows that the petitioner is not entitled to relief). The Court will therefore dispose of the petition as the law and justice require. Rule 8(a), Rules Gov'g § 2254 Cases.

## II. FINDINGS OF FACT

### A. Evidence Presented at Trial

The facts underlying the petitioner's conviction were summarized by the Tennessee Court of

---

[1] These include claims that (1) trial counsel "exhibited anger and animosity" after the petitioner requested (and was denied) new counsel, and "made no effort to adequately defen[d]" the petitioner (ECF No. 1, at 1); (2) trial counsel was ineffective for failing to adequately prepare for his cross-examination of Joanna Anthony, and thereby failed to subject the prosecutor's case to "meaningful adversarial testing" (ECF No. 1, at 1); (3) trial counsel was ineffective for failing to object to the state's introduction of any testimony regarding an Auto-Zone receipt that had been misplaced by the police; (4) the petitioner was denied his Sixth Amendment right to effective counsel when the trial court denied his motion for appointment of new counsel; and (5) the petitioner's due process rights were violated when his sentence was amended on September 25, 2005 to place him on lifetime community supervision. (ECF No. 1, at 1–3; ECF No. 5, at 1.)

Criminal Appeals as follows:[2]

      At trial the victim, Joanna Anthony, testified that on September 14, 2003, she walked her dog from her house down Broad Water Branch Road in rural Putnam County, as was her custom. On the return trip, a man she identified as the defendant pulled up next to her in a red Jeep and inquired about the ownership of a nearby house. When the victim responded that she did not know, the vehicle pulled away, but drove past twice more. Upon again stopping next to the victim, the defendant asked if the vehicle in the driveway of her home was for sale. The victim responded that he would have to ask the owner of the vehicle. The defendant reached down to get a piece of paper, wrote a number on it, and handed it to the victim. As she reached for the paper, he quickly exited the vehicle and apprehended her.

      The victim stated that the defendant held a green and black utility knife to her throat and ordered her to perform oral sex on him. She complied, noting at trial that this went on "[a] few minutes," until he pulled her head back and attempted to kiss her. When she resisted, he again ordered her to perform oral sex on him, with this episode lasting five to ten minutes. The defendant then pulled the victim to her feet, removed her shirt, and began touching her breasts while pushing her toward his vehicle. The victim testified that the defendant threw the utility knife into the seat of the vehicle and attempted to push her into the vehicle. When she resisted, the defendant pinned her against the back door, removed her pants, and performed oral sex on her for approximately five to ten minutes. She testified that the assailant again tried to kiss her and stated, "We can do what you want now." The victim responded by saying, "Why aren't you letting me then?" The defendant then apologized and said, "[I] didn't hurt you, at least not physically. I didn't beat you or anything." The victim was able to escape and ran home.

      Upon returning home, the victim went into her mother's bedroom and sat in a chair until her mother awakened. She testified that she was unable to tell her mother what happened until approximately 3:00 p.m. because she was stressed and frightened. She later told her older brother Peter what happened, and took a shower and washed her clothes because she "felt dirty." The victim stated that the defendant passed by her house "[a]t least three times" in his vehicle and that a family friend was eventually able to obtain the license plate number.

      Approximately three hours after the incident, the victim's mother telephoned Genesis House [FN1] and the Putnam County Sheriff's Department to report the incident. The victim related the incident to the responding deputy and turned over the license plate number and the receipt that the defendant handed the victim. The victim testified that she did not know the defendant and had never seen him before the incident.

      FN1. It appears from the record that Genesis House is an organization that aids abused women.

      On cross-examination, the victim testified that she grew up in Illinois but had moved from place to place since then. She stated that she was home schooled by her mother and grandmother and that she has a learner's permit, but not a driver's license. The victim noted that her only job is with her present employer, Good Shepard Health Foods.

---

[2] State appellate court findings of fact can constitute factual findings in a habeas action. *See, e.g.*, *Girts v. Yanai*, 501 F.3d 743, 749 (6th Cir. 2007); *see also* 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

She recalled that she had not had any alcohol or drugs on the day of the incident and reiterated that she had never seen the defendant before. The victim stated that she believed the defendant got the utility knife out of his pocket and that he threw the knife in the vehicle as she was performing oral sex on him. She acknowledged that she did not seek medical treatment after the encounter and decided not to be examined because of the amount of time that had passed following the incident. The victim acknowledged that she told Officer Donnie Duncan that she did not have any bruises. Although she attempted to run "several times," she stated that she did not scratch the defendant because she was "so scared and stunned."

Ms. Ronney Anthony, the victim's mother, testified that on the day of the incident, she was asleep when the victim came into her bedroom. When Ms. Anthony awakened, she saw the victim sitting in a chair "shaking like a leaf, and very, very quiet." Although she repeatedly questioned the victim, she stated that it took "the best part of an hour to get any idea of what the matter was." Ms. Anthony testified that she decided to call Genesis House and the Sheriff's Department at approximately 3:00 p.m. because the defendant's vehicle had driven past their house four times. On cross-examination, Ms. Anthony testified that she and the victim's grandmother home schooled the victim and that the victim enjoyed living in the country. She further stated that she called Genesis House first because her foremost concern was for the victim's emotional state and safety.

Peter Anthony, the victim's older brother, testified that the victim was in the kitchen when he arrived home from church on the day of the incident. He recalled that the victim appeared to be "in shock," her lips were blue, and she was not talking. Although she initially did not speak of what happened, over time she began to explain the incident "[i]n very simple language." He stated that the defendant's vehicle passed by three times and that a family friend was able to obtain the license plate number. Finally, Mr. Anthony stated that the police responded approximately three hours after he arrived.

On cross-examination, Mr. Anthony stated that the victim enjoyed living in the country and that the country was better for the victim because she was in poor health. He further stated that he was not sure if the victim was under the care of a doctor at the time of the incident but that she was currently being treated by a natural healing doctor in the Carolinas.

Deputy Tony Branch testified that he was employed by the Putnam County Sheriff's Department and that he responded to the subject incident between 5:30 and 6:00 p.m. He stated that when he arrived, the victim and her mother were on the side porch of the house, and the victim was initially not responsive. Deputy Branch stated that when the victim began talking, she gave him the license plate number of the defendant's vehicle; that it was radioed in; and that officers were sent to the defendant's residence. He further noted that the victim gave a written statement of what had occurred. Finally, he stated that he did not recall if the victim gave him the receipt the defendant had given her. On cross-examination, Deputy Branch testified that, although he had patrolled the victim's house on his regular route, he did not know the victim personally.

Deputy Ed Henley testified that he was employed by the Putnam County Sheriff's Department and that he responded to the defendant's house. When he arrived, Deputy Henley asked the defendant to come outside to talk, to which the defendant responded that this "must be about that little girl down on the creek." When Deputy Henley inquired as to what happened, the defendant stated that he saw her and asked her to get in the vehicle, which she did. The defendant then told Deputy Henley that he drove down a side road and that the victim performed oral sex on him at his request. Deputy Henley advised the defendant of his Miranda rights and asked him to again recall the incident with the victim, which he did. On cross-examination, Deputy Henley testified that he knew the defendant because of his previous service as a sheriff's department reserve.

Detective Donnie Duncan testified that he was called to investigate the subject incident. He stated that he did not take a rape kit because the alleged act involved oral sex with no ejaculation. Detective Duncan stated that, although the victim turned over the receipt that the defendant gave her, it had "been misplaced." Detective Duncan recalled that the defendant stated that he and victim had a previous sexual relationship.

On cross-examination, Detective Duncan testified that he knew the defendant because he served as chief while the defendant was a sheriff's department reserve. He stated that he had no problems with the defendant at that time. He further stated that the victim did not call his attention to any bruises and that he did not see any scratches or bruising on the defendant. He stated that he did not recall whether he instructed the victim to see a doctor.

Charles Hardy testified that he works at the Tennessee Bureau of Investigation (TBI) crime lab as a serology and DNA analyst. He further stated that there was no DNA or physical evidence in this case. Hardy noted that he did not swab the inside of the victim's mouth to check for the defendant's DNA because, "the odds of finding that suspect's DNA are so great . . . that you're not going to get it, that it's not something that we would test for." Hardy testified that even if a DNA match was obtained, it would not indicate whether or not the contact was forced.

The defendant testified that he had worked as a mechanic with the Cookeville Housing Authority and as a cook at the Waffle House Restaurant. He noted that he had previously participated as a volunteer firefighter and as a sheriff's department reserve. The defendant stated that he lived on his father's property in a shed that he converted into a one-bedroom apartment. He testified that he had seen and been sexually involved with the victim three months prior. The defendant stated that, at that time, he saw the victim walking down the road and asked her if she needed a ride. Although she refused, the defendant stated that they began talking, that they became physically intimate, and that the victim performed consensual oral sex on him in his vehicle.

He stated that on this occasion, he saw the victim and she appeared to recognize him from their earlier encounter. The defendant recalled that he asked the victim about a nearby residence and that they began talking and eventually kissing. He testified that the encounter again progressed to her performing oral sex on him. Although the defendant stated that he did not have a utility knife in his vehicle, he admitted that officers did find a steak knife upon a consensual search of the vehicle, which he had used to trim wires on his headlight switch. Finally, the defendant stated that his only prior arrest was for public intoxication in the mid-1980's.

On cross-examination, the defendant testified that after their first encounter, he drove down the victim's road one or two times "hoping [he] might get lucky again." Although he knew where the victim lived, he stated that he never approached her house. The defendant indicated that he did not ask about the car in the victim's driveway and did not perform oral sex on her. He estimated that their encounter lasted between fifteen and twenty minutes and further stated that he wrote his phone number on the receipt because she inquired as to how to contact him. The defendant testified that he did not try to intimidate the victim and did not force her to perform oral sex on him. He further stated that he "took off" when he realized that someone was attempting to get his license plate number because the victim stated that she was "afraid [that someone was] going to find out about this."

Billy Joe Smith, the defendant's brother, testified that the defendant came home between 12:00 and 1:00 in the afternoon and that he remained at home until 3:00 or 3:30 p.m. On cross-examination, he testified that he lives in the house with his father, while

the defendant lives in the converted shed, where he has resided for three years. Amy Smith Holloway testified that the defendant is her father and that she spoke with him by phone at his home between 1:30 and 2:30 p.m. On cross-examination, she testified that she talked to the defendant for ten to fifteen minutes and admitted that she did not know what happened after their conversation.

Sara Bright testified that she was married to the defendant for five years and that he has a good reputation for honesty and truthfulness. On cross-examination, she stated that she and the defendant divorced in 1986 and that he has since remarried. Amanda Wright testified that she has known the defendant for approximately four years as a co-worker at the Waffle House and that he has a good reputation for honesty and truthfulness. On cross-examination, she acknowledged that she has socialized with the defendant outside of work only one or two times. Geneleta Ashburn testified that she was previously employed at the Waffle House for sixteen years and has known the defendant "as a very good friend." She likewise stated that he has a good reputation for honesty and truthfulness. On cross-examination, she acknowledged that she has not worked with the defendant in two years, but stated that she has made an effort to keep in touch with him by phone.

David Carlile testified that he has known the defendant for between fifteen and eighteen years and that he has a good reputation for honesty and truthfulness. On cross-examination, he admitted that he has not seen the defendant in two years. Additionally, the State stipulated that the testimony of Freddie Judd, owner of L & J Market, and Richard McBroom, fire chief and city manager of Baxter, would be consistent with the previously presented character witnesses. Following the presentation of evidence, the defendant was convicted of rape, sexual battery, and attempted false imprisonment. [FN2]

FN2. The record reflects that Count One was based upon the act of forced fellatio; Count Two on forced cunnilingus; and Count Three on the defendant's attempt to force the victim into the vehicle.

.

*State v. Smith*, 2006 WL 264468, at *1–*5.

As stated above, the petitioner was originally charged with two counts of aggravated rape and one count of attempted kidnapping. He was found guilty on the lesser included offenses of (1) rape: (2) sexual battery; and (3) attempted false imprisonment. He was sentenced to serve eight years in prison at 100%. The petitioner has now served his jail term, but remains on "community supervision for life" pursuant to Tenn. Code Ann. § 39-13-524(a).

B.    **Post-Conviction Evidence**

The state appellate court summarized the evidence presented at the post-conviction hearing as follows:

Judge Leon Burns testified that he presided over the Petitioner's trial. He stated that, although he did not remember the specific instruction he gave the jury during the Petitioner's trial, the standard instruction includes an admonition that jurors should not discuss the case with any of the witnesses or attorneys in the case. [FN3] Judge Burns recalled that he had "[s]ome vague memory" of an incident during the Petitioner's trial when he noticed that some members of the jury, the court clerk, and two deputies were

sitting at the same table in a restaurant during lunch.  He recalled that he thought he approached the table and told them to separate.  Judge Burns also explained that he thought the jurors sat with the deputies because it was crowded and it was the only place to sit down.

FN3. In fact, the Petitioner read the trial court's admonition from the trial transcript into the record as follows:

[D]uring the course of the trial you should not talk with any witnesses, the [D]efendant or attorney involved in the case.  Please do not talk with them about any subject whatsoever.  You may see them in the hallway or on the elevator or . . . other locations.  If you do, perhaps the best standing rule would be not to say anything to the participants.

Although Judge Burns did not have a specific recollection about what occurred after he witnessed the jurors at the same table as the court clerk and two deputies, he said that it seemed "like I did ask them about it."  However, he stated that he could not "specifically remember what responses" he received.  Judge Burns elaborated, "But if I did not declare a mistrial, I must have come to the conclusion that there was no discussion about the case, that it was just a casual contact there and they weren't talking about the testimony in the case.  I found no prejudice, so I did not grant a mistrial."

Marcia Borys testified that she is the Circuit Court Clerk for Putnam County.  She recalled that she acted as the court clerk during the Petitioner's trial.  She also remembered going to lunch, at the invitation of one of the jurors, with a group of jurors from the Petitioner's trial.  Ms. Borys testified that two deputies, Donnie Duncan and Ed Henley, were already eating at the restaurant that she and jurors went to.  She added, "[T]he restaurant was very crowded and we were headed toward the back.  And Mr. Watts [FN4] just said sit down and so we did."  She recalled that Judge Burns later approached the table and told the jurors and deputies that they should not be sitting together.  Ms. Borys said that there was no conversation about the trial at the lunch table and that the deputies "were very quiet and just ate their lunch and left."  She also recalled that Judge Burns questioned her and the jurors about the incident after they returned from lunch.

FN4. Davis Watts was one of the jurors from the Petitioner's trial.  He was also the juror who invited Ms. Borys to go out to lunch with the group.

Davis Watts testified that he was a juror in the Petitioner's trial.  He recalled that the trial court instructed the jurors not to talk to the witnesses or attorneys in the case.  Mr. Watts stated that he and some of the other jurors had lunch at a small café across from the courthouse.  He "vaguely" remembered that there were two sheriff's deputies at their table.  He testified that he did not remember any conversation between the jurors and the deputies.  Mr. Watts did recall that Judge Burns asked the group to disperse and commented that they should not be sitting together.  He also stated that Judge Burns questioned the jurors after they came back from lunch.  Mr. Watts explained that he did not know that the two deputies were potential witnesses in the Petitioner's trial.

Hazel Lemka, also a juror in the Petitioner's trial, testified that she remembered the trial court telling the jurors that they were not to speak to the attorneys or witnesses in the case.  She said that, during the trial, a small group of the jurors went to the café across the street for lunch and that Ms. Borys "might have" [gone] with them.  When asked if she remembered sitting down at a table with two deputies, she replied, "I remember the place was crowded and we had a short time.  We got our tray and just sat down at the nearest empty chair."  Ms. Lemka said she did not remember Judge Burns saying anything to the group while they were at the restaurant[;] however, she did remember him speaking to

them after lunch. She recalled, "He asked if we had discussed anything, talked about anything that happened in the courtroom or at the trial and we said no." She said that, other than saying hello, she did not speak to the deputies during lunch.

Pamela Malone, another juror from the Petitioner's trial, testified that she recalled that Judge Burns instructed the jury that they could not talk to anyone who was participating in the trial. Ms. Malone testified that she remembered going to lunch with the other jurors. However, when asked if she remembered that two sheriff's deputies were sitting at their table, Ms. Malone maintained that the deputies were not seated at the same table as the jurors. She also stated that the jurors did not talk about the trial during their lunch. Ms. Malone said that she did not recall Judge Burns coming up to their table and speaking to them during lunch. However, she did remember that he questioned the jurors individually after they came back from lunch.

John Magura, also a juror in the Petitioner's trial, described the lunch outing in question as follows:

> I believe I walked over there, got a plate of food, was looking for a place to sit down. I think that Mr. Watts asked me if I wanted to come and sit down. I sat down at the table, I believe Judge Burns came in, saw the two, I don't even remember if there were two, but I just remember him coming over and that there were some deputies over there sitting in the vicinity, I couldn't tell you if they were, these tables are real long, so there were multiple people sitting at the table. But I believe he said something to them and they got up and moved where they were sitting.

Mr. Magura testified that he did not remember Judge Burns questioning the jurors individually after lunch. He also stated that he did not think that he discussed the trial with anyone during lunch.

Deputy Ed Henley, employed by the Putnam County Sheriff's Department, testified that he thought he was introduced to the jury as a potential witness during the Petitioner's trial. He recalled that he ate lunch with Chief Deputy Donnie Duncan, but that the two men "[d]idn't really talk about anything." He stated that he saw Ms. Borys come into the restaurant with a group of people, but that he did not know they were jurors. He described that he and Chief Deputy Duncan were "sitting at the table and of course the restaurant was real crowded that day, so they come in and found a seat wherever they could and sat down." He recalled that the group, which he later found out was composed of jurors, sat at the same table with him and Chief Deputy Duncan. However, he maintained that neither of the two men said anything to the jurors or Ms. Borys. Deputy Henley testified that, after lunch, Judge Burns asked him whether the deputies had talked about the case at the restaurant and that he told Judge Burns they had not.

The Petitioner testified that he thought his trial counsel was ineffective because he "never s[a]t down with me and my witnesses at one time" to discuss "what kind of questions he was going to ask us." He also alleged that his trial counsel did not meet with him enough before trial, recalling that he only met with trial counsel four or five times. The Petitioner stated that he thought his trial counsel should have filed pretrial motions, including a request for a bill of particulars, a motion to suppress his statement, and motions to exclude the AutoZone receipt and the photograph taken of him the night of his arrest. Specifically, with regard to the photograph, the Petitioner testified, "I had been locked up in a jail cell for some four or five hours before the photograph was taken. I had been laying down, been asleep, and I looked pretty messed, pretty rough." The Petitioner also testified that his trial counsel did not show him the discovery he had received from the State until the day before his trial.

The Petitioner stated that he felt his trial counsel was ineffective for failing to ask that a mistrial be declared after the trial court disclosed that it observed five jurors having lunch at the same table as two potential State witnesses. Further, he said that his trial counsel should have questioned the jurors, rather than relying on the questions asked by the trial court. He also said that he believed his trial counsel should have asked the jurors what they talked about during lunch. The Petitioner explained that he felt that, by sitting at the same lunch table, the jurors had "made a social connection with the two deputies" and that he felt the jurors were "totally in favor of the [S]tate."

The Petitioner testified that his trial counsel should have contested the relevance of the testimony of the TBI expert because no DNA testing was done in the case. He explained that he felt the language the TBI expert used "made the jury mad" at him. He also testified that had his trial counsel requested that the jury be sequestered, they would have never had lunch at the same table as the two deputies. The Petitioner also asserted that his trial counsel should have asked for a mistrial to be declared when he found out that the trial court had *ex parte* communication with the jurors at the restaurant. Further, he said that his trial counsel should have raised the issue in his direct appeal.

The Petitioner testified that the trial court should have *sua sponte* declared a mistrial after he saw the jurors eating lunch at the same table as the two potential State witnesses. He also asserted that the trial court erred when it questioned the jury about their progress on reaching a verdict, after they had informed the trial court that they were deadlocked. He elaborated, "I felt that the judge was trying to push them into making a decision one way or the other."

On cross-examination, the Petitioner acknowledged that there were no fact witnesses who could have testified on his behalf and that his trial counsel presented the testimony of eight character witnesses. The Petitioner also admitted that his trial counsel did object when the State moved to introduce the Petitioner's photograph into evidence, but that the trial court overruled his objection.

The Petitioner's trial counsel ("Trial Counsel") testified that he had been an attorney for forty years and, before working at the District Public Defender's Office, he worked as an Assistant District Attorney, in private practice, and as a Federal Bureau of Investigation agent. He testified that he and his investigator "thoroughly investigate[d]" the Petitioner's case, even conducting a "neighborhood investigation," in which they spoke to all of the neighbors in the area around where the alleged rape occurred.

Regarding the lunch incident, Trial Counsel testified that he thought Judge Burns did a good job of questioning the jurors and that he "didn't know of anything else [he] could ask." Trial Counsel also explained that he felt like he had a "good jury" and that "it was [his] strategy to leave the jury in place." When asked why he did not file a motion for a new trial on the issue of the trial court's *ex parte* communication with the jurors, Trial Counsel explained, "I didn't see anything improper that [Judge Burns] had said to them or anything."

Trial Counsel stated that he was pleased with the outcome of the Petitioner's trial because rather than finding him guilty of two counts of aggravated rape, a Class A felony, and one count of aggravated kidnapping, a Class B felony, as he was charged, the jury convicted the Petitioner of the lesser-included offenses of rape, a Class B felony, sexual battery, a Class E felony, and attempted false imprisonment, a Class B misdemeanor.

*Smith v. State*, 2010 WL 4952541, at *5–*9.

## III.    DISCUSSION

As an initial matter, the Court must ascertain which claims the petitioner intends to have submitted for review, given that he filed three separate pleadings.   The general rule is that when a pleading is amended pursuant to Federal Rule of Civil Procedure 15(a), the amended pleading supersedes the original pleading; "the original pleading no longer performs any function in the case and any subsequent motion made by an opposing party should be directed at the amended pleading."   *Clark v. Johnston*, 413 F. App'x 804, 811–12 (6th Cir. 2011) (quoting 6 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1476 (3d ed. 2010) (footnote omitted).   If, however, the party submitting a pleading clearly intends it to supplement rather than supersede the original pleading, some or all of the original pleading can be incorporated in the amended pleading.   *Id.* (citing *Wright & Miller*, *supra*; *Anson v. Corr. Corp. of Am.*, No. 4:06–CV–1672, 2007 WL 1467058, at *1 n.2 (N.D. Ohio May 16, 2007)).

In this case, the first amendment to the petition, submitted on July 12, 2011, was clearly intended to supplement rather than to supersede the original petition.   (*See* ECF No. 5, at 2 ("I ask this court again to add this amend to my original complaint.").)   The most recent petition, however, submitted on August 11, 2001, does not clearly evince an intent to supplement rather than supersede the prior filings.   The respondents addressed only the claims raised in the last-filed petition based on their apparent assumption that the petitioner intended for this document to supersede his prior pleadings.

The Court finds that this conclusion was reasonable in light of the fact that the second amendment does not expressly state that it is intended to supplement the original claims and because it incorporates several of the issues raised in the earlier two pleadings.   Although the earlier filings incorporated several claims that were not incorporated in the final version of the petition, the Court has conducted a cursory review of those claims and finds that all but one defaulted and therefore unreviewable by this Court anyway.   With respect to the sole non-overlapping claim that was properly exhausted, the Court notes that the state court's resolution of that claim was based on a reasonable application of clearly established federal law and a reasonable application of the facts to the law, based on the evidence presented at the post-conviction hearing.   Thus, although *pro se* pleadings are to be construed liberally, this Court finds based on all the circumstances that the petitioner intended the most

recently filed document to supersede his earlier filings. The Court will therefore only consider the six claims raised therein.

As discussed below, the record clearly establishes that of those claims, four concern federal constitutional issues that were fairly presented to the Tennessee state courts for consideration as required by 28 U.S.C. § 2254(b)(1)(A), and as such are properly before this Court for review under § 2254(d), but the petitioner has not shown that the state court's resolution of those claims was constitutionally unreasonable. The remaining two claims were not properly exhausted in the state court, and may not be considered by this Court.

**A.  The Fully Exhausted Federal Claims**

*1.  General Standard of Review of Exhausted Claims*

When a petitioner's application for a writ of habeas corpus raises a federal constitutional claim that has been properly exhausted in the state courts, this Court's review of the state court's resolution of the issue is quite limited. The standard for reviewing applications for the writ of habeas corpus is set forth in 28 U.S.C. § 2254(d). This section states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Id.* Additionally, this Court must presume the correctness of state court factual determinations, and the petitioner has the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Cremeans v. Chapleau*, 62 F.3d 167, 169 (6th Cir. 1995) ("We give complete deference to state court findings unless they are clearly erroneous."), *abrogated on other grounds by Thompson v. Keohane*, 516 U.S. 99, 111 (1995).

*2.  Claims of Ineffective Assistance of Counsel*

All the fully exhausted claims before the Court concern ineffective assistance of counsel. The operative federal standard pertaining to ineffective-assistance claims is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), which states that a defendant cannot prevail on an ineffective-

assistance claim unless he shows that his counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. To prove this element, the defendant must first demonstrate that counsel's representation fell below an objective standard of reasonableness. *Id.* at 688. In judging an attorney's conduct, the court is to beware of the "distorting effects of hindsight," and to "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 689–90. Additionally, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). Second, even if his counsel's behavior fell below the acceptable standard, to prevail the defendant must prove that his defense was prejudiced by his counsel's unprofessional errors; that is, that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Id.* "Unless a [petitioner] makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 687.

### Claim 1: Trial Counsel's Failure to Object or to Question Jurors

The record reflects that just before lunch on the first day of trial, the trial judge admonished the jurors to remember the instructions they had been given, and specifically reminded them that they should not talk to fellow jurors or other persons about the case, and should not read, view or listen to any accounts of the trial. (Trial Tr. 62:25–63:4.) After lunch, before the jury was called back in, the judge advised counsel for both parties that he had seen a group of five jurors sitting at the same table as a two potential witnesses for the state in the case. (Trial Tr. 64:2–7.) When the judge saw this, he suggested to the witnesses that "they shouldn't be there," and then admonished the jurors "that they should not let that familiarity or relationship in any way interfere with their verdict and fairness in the case." (Trial Tr. 64:9–11.) The judge told the parties that when he saw the potential witnesses, they were almost finished with their lunch anyway, and they left immediately after the judge spoke to them. The jurors remained seated where they were and finished their lunch.

The judge also told the parties that the jurors had told him that they had not discussed the trial in

any way, and that they were following the court's admonitions. The judge nonetheless believed that the jurors and witnesses should be questioned about the event on the record. He stated that after such questioning he would allow defense counsel to "take whatever action he wishes to take in that regard." (Trial Tr. 64:20–21.) Thereafter, the judge questioned the five jurors and both potential witnesses on the record. Several of the witnesses relayed how it came to be that they were sitting together, and each of the witnesses testified that there was no discussion of the case and very little discussion of any kind among them. The two potential witnesses, Officer Donnie Duncan and Deputy Ed Henley, spoke little, if at all. Most of the jurors had not realized that the other two people already seated at their large table in the crowded buffet-style restaurant were potential witnesses. The jurors also testified that the encounter would not influence their evaluation of the testimony received at trial. Defense counsel did not question any of the jurors, though he was given the opportunity to do so, nor did he object to going forward with the trial after the incident. Defense counsel did not raise this issue of the improper contact between the jurors and witnesses on direct appeal.

The petitioner asserted at the post-conviction stage that his counsel was ineffective in his handling of the incident in general, and specifically for failing to question the jurors himself about what they had talked about during lunch. At the post-conviction hearing, Judge Leon Burns, four of the five jurors and one of the two police officer witnesses involved in the incident all testified, along with the petitioner's trial counsel. The various jurors' testimony regarding the event was somewhat vague as a result of the passage of time, but was basically consistent with the testimony they had given during the trial. The petitioner's trial counsel testified that he had practiced law for forty years, and been a criminal defense attorney with the Cookeville District Public Defender's Office for eighteen years. He stated that he believed Judge Burns had done a "good job" questioning the jurors and witnesses after lunch, and that he "didn't know of anything else [he] could ask." (Post-Conviction Hr'g Tr. 133:15–16.)

The post-conviction court denied relief on the issue of whether the petitioner's trial counsel's conduct fell below the professional standard as a result of his failure to question the jurors regarding the lunch incident, finding as factual matters that the trial judge had appropriately admonished the jurors prior to lunch not to speak to anyone about the trial, that the five jurors had joined with the two witnesses at a large table very briefly and the two witnesses left as soon as they were directed to do so by the judge,

and that the judge had individually questioned all the parties involved, on the record, and concluded that no inappropriate conduct had occurred. Based on that evidence, the post-conviction court held that further questioning by trial counsel would not have been fruitful, because the petitioner had not shown that he was in any way prejudiced by the jurors' eating lunch in proximity to the two potential witnesses. (*See* ECF No. 23-9, at 77.) The Tennessee Court of Criminal Appeals, after reviewing the testimony given at the post-conviction hearing, affirmed on the basis that the petitioner had not shown that he was prejudiced by his trial counsel's actions. *Smith v. State*, No. M2009-02077-CCA-R3-PC, 2010 WL 4952541, at *13 (Tenn. Ct. Crim. App. Nov. 29, 2010). In reaching that conclusion, the appellate court correctly identified *Strickland v. Washington* as setting forth the standard governing post-conviction claims for ineffective assistance of counsel.

This Court finds that the state court's ruling was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court, nor was it based on an unreasonable determination of the facts in light of the evidence presented at the post-conviction hearing. The petitioner is not entitled to relief on the basis of this claim.[3]

### Claim 2: Trial Counsel's Failure to Request a Mistrial

The petitioner also argued in state post-conviction proceedings that his trial counsel was ineffective for failing to request a mistrial as a result of the lunchtime encounter between the five jurors and two potential witnesses. The post-conviction court concluded, based on the same facts outlined above, that there was no reason the court would have granted a motion for a mistrial, and that the petitioner had not shown that his counsel was ineffective for failing to seek a mistrial or that the petitioner was prejudiced by that alleged failure. (*See* ECF No. 23-9, at 77–78.) The Tennessee Court of Criminal Appeals affirmed on the basis that its review of the record confirmed that the trial court had "thoroughly investigated the lunch incident," and the petitioner had not shown that he was prejudiced by his trial counsel's failure to request a mistrial. *Smith*, 2010 WL 4952541, at *12.

---

[3] This court agrees with the government that, to the extent the petitioner is focused on his trial counsel's failure to "object," it is unclear to what he should have objected. The Court has construed this claim as coextensive with the argument that counsel should have questioned the jurors. To the extent that the petitioner did intend to raise as an issue his trial counsel's failure to "object" to the lunch seating arrangement or the trial judge's handling of the matter *post hoc*, the claim was never raised in the state court and is therefore subject to dismissal on the basis that it is unexhausted.

Again, this Court finds that the state court applied the appropriate legal standard, and its ruling was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court, nor was it based on an unreasonable determination of the facts in light of the evidence presented at the post-conviction hearing. The petitioner has still not shown that he was prejudiced in any way by the brief lunch-time encounter between the jurors and witnesses, and he is not entitled to relief on the basis of this claim.

### Claim 3: Trial Counsel's Failure to Raise the Lunch Issue on Direct Appeal

The petitioner raised this claim in his state post-conviction proceedings, but the claim was rejected, both initially and on direct review, on the grounds that the petitioner had not shown that he was prejudiced by his trial counsel's failure to raise the lunch issue on direct appeal. This Court agrees that the plaintiff has not shown that he had a remote chance of prevailing on this issue even if it had been raised on appeal. The state appellate court in rejecting this claim applied the appropriate legal standard, and its factual conclusions were not unreasonable in light of the evidence presented at trial or in the post-conviction proceedings. This claim does not warrant relief.

### Claim 4: Trial Counsel's Failure to File a Motion to Suppress

The petitioner asserts that his counsel was ineffective for failing to file a motion to suppress the statement he gave to Officer Ed Henley prior to having been alerted to his right to remain silent, and prior to signing any written waiver.

At the post-conviction hearing, the petitioner's trial counsel testified that he did not "fail" to file a pretrial motion to suppress; instead he consciously decided that (1) it would have been futile to object because the petitioner was not in custody at the time the initial statement was given; and (2) suppression of the petitioner's subsequent written statement was unnecessary because all the petitioner's statements were consistent with each other and consistent with the petitioner's trial testimony, and thus tended to bolster the petitioner's credibility and his proclaimed innocence. (Post-Conviction Tr. at 139–40.) The post-conviction court accepted the attorney's testimony and found that his representation had not been deficient, and also found that the petitioner had not shown that he was prejudiced by any purported errors by his counsel. The Tennessee Court of Criminal Appeals affirmed those conclusions.

This Court finds that the state court's ruling was consistent with clearly established federal law

and was based on a reasonable determination of the facts in light of the evidence presented at the post-conviction hearing. The petitioner is not entitled to relief on this basis. Even if the Court were to consider the issue on the merits, the Court would agree with the state court's conclusion that the petitioner's trial counsel's performance in this regard was not deficient, and that the petitioner was not prejudiced by the introduction of the statements he gave Officer Henley, since they simply corroborated the petitioner's trial testimony.

### B. The Unexhausted Claims

Generally, a federal district court will not entertain a petition for writ of habeas corpus unless the petitioner has first exhausted all available state-court remedies for each claim in his petition. 28 U.S.C. § 2254(b)(1). While exhaustion is not a jurisdictional requirement, it is a strictly enforced doctrine which promotes comity between the states and the federal government by giving the state an initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). Consequently, as a condition precedent to seeking federal habeas corpus relief, the petitioner is required to fairly present his claims at every available level of the state court system. *Rose v. Lundy*, 455 U.S. 509, 518–20 (1982); *see also Duncan v. Henry*, 513 U.S. 364, 365–66 (1995) ("[A] federal habeas petitioner . . . [must] provide the state courts with a 'fair opportunity' to apply controlling legal principles to the facts bearing upon his constitutional claim."). Moreover, "the doctrine of exhaustion requires that a claim be presented to the state courts under the same theory in which it is later presented in federal court." *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998). Once a petitioner's federal claims have been raised in the highest state court available, the exhaustion requirement is satisfied, even if that court refused to consider the claims. *Manning v. Alexander*, 912 F.2d 878, 883 (6th Cir. 1990).[4]

A habeas petitioner bears the burden of demonstrating that he has properly and fully exhausted his available state court remedies with respect to each of the claims he presents for federal habeas review. *Prather v. Rees*, 822 F.2d 1418, 1420 n.3 (6th Cir. 1987) (citation omitted). If a habeas petitioner

---

[4] In Tennessee, presentation of the claims to the state Supreme Court is not required for exhaustion. Instead, "once the Court of Criminal Appeals has denied a claim of error, 'the litigant shall be deemed to have exhausted all available state remedies available for that claim.'" *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003) (quoting Tenn. S. Ct. R. 39).

retains the right under state law to raise a claim by any available procedure, he has not exhausted that claim. 28 U.S.C. § 2254(c). Ordinarily, habeas petitions containing unexhausted claims are dismissed without prejudice in order to permit the petitioner the opportunity to pursue them in state court. *Alley v. Bell*, 307 F.3d 380, 385 (6th Cir. 2002) (citing *Rose*, 455 U.S. at 518, 520–22); *see also Rhines v. Weber*, 544 U.S. 269, 273–75 (2005) (reconfirming the continued relevance of *Rose* under the Antiterrorism and Effective Death Penalty Act of 1996). However, if an unexhausted claim would be procedurally barred under state law, for instance by statutes of limitations or state rules barring successive petitions, then the claim is deemed exhausted (because no further state review is available) but procedurally defaulted, and may not be considered by the federal court on habeas review except under extraordinary circumstances. *Alley v. Bell*, 307 F.3d 380, 385–86 (6th Cir. 2002) (citations omitted); *In re Cook*, 215 F.3d 606, 607–08 (6th Cir. 2000). In order to obtain consideration of a claim that is procedurally defaulted, a petitioner must demonstrate both cause for the procedural default and actual prejudice resulting from the alleged constitutional errors, or alternatively that failure to consider the claims will result in a "fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *cf. Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Engle v. Isaac*, 456 U.S. 107, 129 (1982); *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).

With these principles in mind, the Court will proceed to consider Smith's unexhausted claims.

### 1. Claim 5: The Trial Judge's Failure to Declare a Mistrial

The petitioner claims he was deprived of his constitutional right to a fair trial and due process as a result of the trial judge's failure to *sua sponte* declare a mistrial after he witnessed five jurors having lunch with two state witnesses. The petitioner raised this argument in state post-conviction proceedings, but the post-conviction court denied relief initially on the basis that the petitioner had not presented sufficient proof at the post-conviction hearing to establish that he had been deprived of due process. The Court of Criminal Appeals denied relief on the basis that the petitioner could have but did not present this issue for review in his direct appeal, and that he had therefore waived the issue, citing Tenn. Code Ann. § 40-30-106(g). *Smith*, 2010 WL 4952541, at *9. This Court's review of the petitioner's appellate brief confirms that the issue was not raised on direct appeal.

Section 40-30-106(g) states that any ground for relief raised at the post-conviction stage "is waived if the petitioner personally or through an attorney failed to present it for determination in any

proceeding before a court of competent jurisdiction in which the ground could have been presented," unless the failure resulted from some state action in violation of the federal or state constitution or the claim is based upon a constitutional right that was not recognized as existing at the time of trial (but only if "the federal or state constitution requires retroactive application of that right"). Tenn. Code Ann. § 40-30-106(g).

"Under the procedural default doctrine, a federal court is generally barred from considering an issue of federal law arising from the judgment of a state court if the state judgment rests on a state-law ground that is both independent of the merits of the federal claim and an adequate basis for the state court's decision." *Munson v. Kapture*, 384 F.3d 310, 313–14 (6th Cir. 2004) (internal quotations and citations omitted). A state-law ground is adequate when the rule at issue is "firmly established and regularly followed." *Lee v. Kemna*, 534 U.S. 362, 376 (2002).

It is clear that the Tennessee Court of Criminal Appeals' judgment rests on a state-law ground independent of the merits of the petitioner's underlying due-process claim. Further, Tenn. Code Ann. § 40-30-106(g) is firmly established and regularly followed. *See, e.g.*, *Williams v. State*, No. W2010-01013-CCA-R3-PC, 2011 WL 3903224, at *8 (Tenn. Ct. Crim. App. Sept. 1, 2011) (applying rule); *Osborne v. State*, No. M2010-00065-CCA-R3-PC, 2011 WL 3612205, at *2 (Tenn. Crim. App. Aug. 16, 2011) (applying rule). *See also Hutchison v. Bell*, 303 F.3d 720, 738 (6th Cir. 2002) (concluding that Tennessee's waiver rule is firmly established and regularly followed, citing *Cone v. Bell*, 243 F.3d 961, 969 (6th Cir. 2001), *overruled on other grounds by Bell v. Cone*, 535 U.S. 685 (2002)). Accordingly, this claim is procedurally defaulted and therefore not subject to consideration by this Court absent extraordinary circumstances. As the petitioner here has not demonstrated cause for the procedural default or actual prejudice resulting from the alleged constitutional errors, or shown in the alternative that failure to consider the claims will result in a "fundamental miscarriage of justice," *Coleman v. Thompson*, 501 U.S. 722, 750 (1991), this Court declines to consider this claim on the merits.[5]

---

[5] Even if it were considered on the merits, this claim would not warrant relief. For the same reasons that the petitioner has failed to show prejudice arising from his trial counsel's failure to move for a mistrial, the petitioner has not shown that he was deprived of due process as a result of the trial court's decision not to declare a mistrial. The trial judge thoroughly investigated the lunch incident and concluded that no improper contact had occurred and that the petitioner was not in any way prejudiced by five jurors' having briefly sat at the same table as two State witnesses during lunch. That decision is amply supported by the evidentiary record.

### 2. Claim 6: The Trial Judge's *Ex Parte* Communications with the Jury

The petitioner asserts that he was deprived of his constitutional right to a fair trial and due process as a result of the trial judge's *ex parte* communications with the jury and state witnesses upon the judge's seeing them sitting at the same table having lunch. Although the petitioner raised this claim in his initial post-conviction brief (*see* ECF No. 23-9, at 22 (Petition for Post-Conviction Relief at 18)), he did not raise it in his direct appeal or in the appeal of the denial of his post-conviction petition.[6] A claim is not fully exhausted until a state prisoner has given "the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). The petitioner's failure to raise a claim in the Tennessee Court of Criminal Appeals, whether on direct appeal or in post-conviction, means that he did not fully exhaust that claim.

Further, the time for presenting this claim to the Tennessee Court of Appeals has long-since expired. The petitioner is now procedurally barred from raising this issue before the Tennessee Court of Criminal Appeals by the thirty-day period provided in Rule 4 of the Tennessee Rules of Appellate Procedure, and by the one-petition rule applicable to post-conviction petitions, set forth in Tenn. Code Ann. § 40-30-102. This Court therefore finds that this unexhausted claims is procedurally defaulted. Because the petitioner has not shown any cause for the failure to exhaust, or prejudice resulting from an alleged constitutional errors, the Court declines to consider the issue.

## IV. CONCLUSION

For the reasons set forth herein, the Court finds that Smith's petition is without merit. The petition for the writ of habeas corpus will therefore be denied, and this matter dismissed.

The Court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a § 2254 petitioner. Rule 11, Rules Gov'g § 2254 Cases. The petitioner may not take an appeal unless a district or circuit judge issues a COA. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1). A COA may issue only if the petitioner "has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the COA must "indicate which specific issue or issues satisfy the

---

[6] In his post-conviction appeal, the petitioner contested the *ex parte* communications between the jurors and the two witnesses, but did address the issue of *ex parte* communications between *the judge* and the jurors.

[required] showing . . . ." 28 U.S.C. § 2253(c)(3). A "substantial showing" is made when the petitioner demonstrates that "'reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were "adequate to deserve encouragement to proceed further."'" *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). "[A] COA does not require a showing that the appeal will succeed." *Miller-El*, 537 U.S. at 337. However, courts should not issue a COA as a matter of course. *Id.*

In this case, no reasonable jurist would find that Smith's trial counsel's performance was deficient under the facts presented here, nor has the petitioner "made a substantial showing of the denial of a constitutional right" to due process or to any other federal right. 28 U.S.C. § 2253(c). The Court will therefore deny a COA as to the petitioner's claims.

An appropriate order will enter.


Kevin H. Sharp
United States District Judge